1
2
3
4                    **UNITED STATES DISTRICT COURT**
5                          **DISTRICT OF NEVADA**
6                                  * * *
7    STEVEN SCOTT,                        Case No. 2:24-cv-01555-RFB-DJA
8              Plaintiff,                         **ORDER**
9         v.
10   OLIVES, INC.,
11              Defendant.
12
13        Before the Court is Plaintiff Steven Scott's (ECF No. 10) Motion for Default Judgment and
14   (ECF No. 24) Motion for Attorney's Fees and Costs. For the following reasons, the Court grants
15   both Motions in part.
16
17   **I.    PROCEDURAL HISTORY**
18        Plaintiff filed his Complaint against Defendant Olives, Inc. ("Olives") on August 23, 2024.
19   ECF No. 1. The Complaint brought the following claims: (i) Racial Discrimination – Disparate
20   Treatment (Title VII); (ii) Retaliation (Title VII); (iii) Racial Discrimination – Hostile Work
21   Environment (Title VII); (iv) Racial Discrimination – Disparate Treatment (NRS 613.330); (v)
22   Retaliation (NRS 613.330); (vi) Racial Discrimination – Hostile Work Environment (NRS
23   613.330); (vii) Race Discrimination (42 U.S.C § 1981); (viii) Hostile Work Environment (42
24   U.S.C. § 1981); (ix) Retaliation (42 U.S.C. § 1981); (x) Constructive Discharge.
25        On September 9, 2024, Plaintiff moved for a preferential trial setting due to his diagnosis
26   with Stage 4 cancer. ECF No. 5. On September 11, 2024, the Complaint was personally served on
27   an individual authorized to accept service on behalf of the registered agent of Defendant Olives,
28   Inc. ("Olives"). ECF No. 6; see also ECF No. 25 (identifying the individual upon whom the

Complaint was served as a person authorized to receive process for Defendant). Olives failed to file an answer, motion to dismiss, or any other response, and, to date, has not appeared in this action.

On October 15, 2024, Plaintiff filed a Motion for Entry for Clerk's Default. ECF No. 7. On October 30, 2024, the Clerk entered default as to Olives. ECF No. 8. On November 11, 2024, the Court denied the Motion for Preferential Trial setting as moot due to Olives' default and ordered Plaintiff to indicate whether he intended to file a motion for default judgment under FRCP 55(b). ECF No. 9. On November 21, 2024, Plaintiff filed the instant Motion for Default Judgment. ECF No. 10.

The Court set the instant Motion for a prove up hearing on damages, and ordered supplemental briefing, a witness list, an exhibit list, exhibits, and a separate motion for attorney's fees and costs pursuant to Fed R. Civ. Proc. § 54(d)(2)(B) and Local Rule 54-15. ECF Nos. 21-22. Plaintiff submitted the supplemental briefing and exhibits in advance of the hearing. ECF Nos. 23-24. Plaintiff's briefing seeks $100,000 in compensatory damages plus $40,000 in attorney's fees, based on Plaintiff's contingency fee agreement with counsel, and costs in the amount of

On April 29, 2025, Plaintiff filed proof of personal service on Olives of a proposed order to show cause why Plaintiff's Motion for Default Judgment and Motion for Attorney's Fees and Costs should not be granted. ECF No. 25.  The papers were served on April 16, 2025, and included the date of the hearing on the Motion for Default Judgment on May 1, 2025, and Plaintiff's proposed order granting default judgment against Olives. Id. Olives did not respond or appear at the May 1st hearing. ECF No. 28.

At the prove up hearing, the Court examined Plaintiff under oath as to his claimed damages for emotional distress. Id. The Court found the evidence sufficient to grant default judgment from the bench, with the instant written Order setting forth the Court's factual and legal findings, as well as damages awarded, to follow. Id. The Court further explained that it would not grant attorney's fees based on counsel's contingency fee agreement, and ordered Plaintiff's counsel, Ms. Jorgensen, to file a supplemental affidavit setting forth the amount of work done by counsel and costs incurred by Plaintiff. Id. She did so, with accompanying exhibits. Id.; ECF No. 29.

1    The Court's written Order granting Plaintiff default judgment against Olives, and granting,

2    in part, Plaintiff's Motion for Attorney's Fees and Costs follows.

3

4    **II.    FACTUAL FINDINGS**

5    The following facts are alleged by Plaintiff in his Complaint and assumed as true. Where

6    indicated, the Court further makes factual findings from the evidence submitted at the May 1st,

7    2025 hearing on the Motion for Default Judgment.

8    Plaintiff is an African-American man with over 20 years of experience as a preparatory

9    line cook. Olives is a corporation operating in Nevada and registered in Massachusetts, which

10   owns and runs the Las Vegas restaurant where Plaintiff was employed, "The Beast."  At all times

11   relevant, Olives was an employer within the meaning of Title VII.

12   Plaintiff was hired by Olives as a preparatory line cook at the Beast in or around July of

13   2022.[1] Kriztina Bessenyei and Candice (unknown last name) were Plaintiff's coworkers. Ali was

14   the Head Chef at the Beast and Plaintiff's direct supervisor. At work, Kriztina and Candice made

15   fun of Plaintiff's taste in music as it related to his skin color, deliberately embarrassed him in front

16   of co-workers by undermining his intelligence and called him the n-word. They also made jokes

17   about him needing to go get his "bananas" as a "monkey." Plaintiff was informed that Defendant's

18   policy was that he should not speak to other employees regarding these issues but go directly to

19   human resources. Plaintiff attempted to stop the harassment by his coworkers with kind acts, such

20   as bringing them flowers and coffee. Other employees asked the Kriztina and Candice to refrain

21   from making these racially derogatory remarks to Plaintiff, but they continued, responding they

22   could do as they pleased. The racially derogatory comments and jokes continued unabated.

23   At the company's 2022 Christmas party, Plaintiff brought his daughter and grandchildren.

24   Kriztina and Candice made jokes about Plaintiff being a monkey in front of his family, and in front

25   of his supervisor Head Chef Ali.

26   Plaintiff reported the racial harassment to the Defendant's human resources manager,

27

28   _____

[1] The Complaint states Plaintiff was hired on July 7, 2023, which appears to be a typographical error. At the hearing Plaintiff testified he began working for Defendant in July of 2022.

Christine Masters ("HR Manager"), in early January of 2023. As shown by the email exchanges between Plaintiff and HR, he described his coworkers racially derogatory jokes, including the comments made at the Christmas party in front of Plaintiff's family members and supervisor. Plaintiff also filled out a handwritten complaint on Defendant's "voluntary statement" form describing the ongoing racial harassment, including "nigger jokes," and explaining that as someone raised by civil rights activists he did not approve of such jokes.

Defendant's HR Manager Christine Masters acknowledged Plaintiff's complaints and indicated she would discuss the issue with Defendant's upper management and an investigation would be conducted. He was informed that the behavior complained of was not tolerated at The Beast and the complains would be taken seriously. Masters conducted a cursory investigation and, in or around January 20, 2023, informed Plaintiff, despite clear evidence to the contrary, that the investigation found there was no malicious intent in the racially derogatory remarks. Defendant took no disciplinary or other remedial action.

After the investigation concluded, the coworkers' racial harassment continued and intensified—they seemed more emboldened and made racially derogatory remarks during most of Plaintiffs shifts with them. Plaintiff again complained to his supervisors, who took no action in response. Because he could no longer endure the racially discriminatory treatment he was subjected to at work, Plaintiff resigned in February of 2023.

As a result of the degradation Plaintiff was subjected to at work and Olives' failure to intervene, culminating in his constructive discharge, the Court finds from the record that he suffered and continues to suffer severe emotional distress, including embarrassment, humiliation, and mental and emotional pain and suffering.

Further, the Court finds from the email exchanges between Plaintiff and Olive's HR Manager that Olives made the decision to take no disciplinary action against its racially harassing employees based on a spurious conclusion: that the employees' n-word and monkey jokes were made without malicious intent. And when, after the HR investigation, Plaintiff complained to his supervisors that the harassment was ongoing and intensifying, Olives still took no action. From this record, the Court finds Olives acted with reckless disregard of Plaintiff's federally protected

1  civil rights. The Court also notes Olives' decision not to participate in this action further evidences

2  its indifference to its legal obligation to maintain a workplace free of racial discrimination.

3

4  **III.    LEGAL STANDARD**

5      The granting of a default judgment is a two-step process directed by Rule 55 of the Federal

6  Rules of Civil Procedure. Fed. R. Civ. P. 55; Eitel v. McCool, 782 F.2d 1470, 1471 (9th Cir. 1986).

7  The first step is an entry of clerk's default based on a showing, by affidavit or otherwise, that the

8  party against whom the judgment is sought "has failed to plead or otherwise defend." Fed. R. Civ.

9  P. 55(a). Once a default has been entered, the district court has discretion to grant default judgment.

10  Fed. R. Civ P. 55(b); Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980).

11      Factors which a court, in its discretion, may consider in deciding whether to grant a default

12  judgment include: (1) the possibility of prejudice to the plaintiff; (2) the merits of the substantive

13  claims; (3) the sufficiency of the complaint; (4) the amount of money at stake; (5) the possibility

14  of a dispute of material fact; (6) whether the default was due to excusable neglect; and (7) the

15  strong policy in favor of deciding cases on the merits. Eitel, 782 F.2d at 1471–72. If an entry of

16  default is made, the Court accepts all well-pleaded factual allegations in the complaint as true;

17  however, conclusions of law and allegations of fact that are not well-pleaded will not be deemed

18  admitted by the defaulted party. DirecTV, Inc. v. Hoa Huynh, 503 F.3d 847, 854 (9th Cir. 2007).

19      The moving party must further prove all claimed damages, as the Court does not accept

20  allegations relating to the amount of damages in the complaint as true. Geddes v. United Fin. Grp.,

21  559 F.2d 557, 560 (9th Cir. 1977). Courts in this circuit have recognized the burden on a plaintiff

22  to prove damages "is relatively lenient in the default judgment context." AirDoctor, LLC v.

23  Xiamen Qichuang Trade Co., 134 F.4th 552, 557 (9th Cir. 2025) (Berzon, M., concurring) (citing

24  Philip Morris USA, Inc. v. Castworld Prods., Inc., 219 F.R.D. 494, 498 (C.D. Cal. 2003)). As one

25  district court noted, "courts have accepted less precise estimates of damages where a defendant

26  frustrates the discovery of a precise amount by defaulting in the action." Wecosign, Inc. v. IFG

27  Holdings, Inc., 845 F. Supp. 2d 1072, 1084 (C.D. Cal. 2012).

28      ///

1    **IV.    DISCUSSION**

2    Plaintiff has complied with the procedural requirements for a default judgment under Fed.

3    R. Civ. P. 55(a), as the Clerk has entered default against Olives for failing to appear in this action.

4    Additionally, although notice under Rule 55(b)(2)) is not required where a defendant fails to

5    appear, Plaintiff served notice of the motion and evidentiary hearing on Olives. Fed R. Civ. P.

6    55(b)(2) ("[I]f the party against whom a default judgment is sought has appeared . . .that party or

7    its representative must be served with written notice of the application at least 7 days before the

8    hearing.). Therefore, whether to grant default judgment against Olives is within this Court's

9    discretion. Aldabe, 616 F.2d at 1092. As set forth below, applying the Eitel factors, the Court,

10    finds default judgment is warranted.

11    **A.  The First, Fifth, Sixth, and Seventh Eitel Factors Favor a Default Judgment**

12    In considering the first, fifth, sixth, and seventh Eitel factors, the Court finds they favor

13    entry of default judgment against Olives.

14    The first Eitel factor considers whether Plaintiff will suffer prejudice if default judgment

15    is not entered. See Eitel, 782 F.2d 1470 at 1471. Because Olives has not appeared in this action,

16    Plaintiff will be left without recourse or recovery for the violation of his civil rights if judgment is

17    not entered. This factor thus supports the entry of default judgment.

18    The fifth Eitel factor considers the possibility of a dispute of material fact. See id. at 1471-

19    72. Because Olives has failed to plead or otherwise defend in this action, the court accepts the

20    well-pleaded facts in the Complaint as true. See TeleVideo Sys. 826 F.2d at 917-18. A defendant's

21    failure to respond to a complaint indicates that "the likelihood that any genuine issue may exist is,

22    at best, remote." Phillip Morris USA, Inc. v. Castworld Prods., Inc., 219 F.R.D. 494, 500 (C.D.

23    Cal. 2003). Additionally, although not necessary where a defendant has failed to respond to a

24    complaint, Plaintiff submitted evidence at the prove up hearing corroborating his factual

25    allegations, including a written statement he wrote complaining of racial harassment on Olives'

26    "voluntary statement" form, and email exchanges between himself and Olives' HR Manager that

27    detail the substance of Plaintiff's complaints of racial harassment, Olives' investigation, and its

28    decision not to take disciplinary or other remedial action after finding no malicious intent in its

- 6 -

employees' harassment of Plaintiff. Therefore, there is little possibility of a dispute of material fact and this factor supports default judgment against Olives.

The sixth <u>Eitel</u> factor considers whether the default resulted from excusable neglect. <u>See</u> Eitel, 782 F.2d at 1472. In this case, Plaintiff, through a process server, served not only his Complaint on Olives, but also notice of his application for default judgment against it and advanced notice of the hearing, even though such notice is not required where a defendant has failed to appear. <u>See</u> Fed. R. Civ. P. 55(b)(2) (requiring written notice of an application for default judgment on a party who "appeared personally or through a representative"). Under the circumstances, there is no evidence that Olives' failure to appear in this action or respond to the instant Motion was the result of excusable neglect. Thus, this factor also supports default judgment.

The seventh <u>Eitel</u> factor considers the preference for deciding cases on the merits "wherever reasonably possible." <u>See</u> <u>Eitel</u>, 782 F.2d at 1472. This factor acknowledges that "default judgments are ordinarily disfavored. <u>Id.</u> But where, as here, a defendant's default is the reason there can be no resolution on the merits, this factor is not sufficient to prevent entry of default judgment. <u>See e.g.</u>, <u>PepsiCo, Inc. v. California Sec. Cans</u>, 238 F.Supp.2d 1172, 1177 ("Defendant's failure to answer Plaintiff's Complaint makes a decision on the merits impractical, if not impossible.")

**B.  The Merits of Plaintiff's Claims and Sufficiency of the Complaint**

The second and third <u>Eitel</u> factors evaluate the merits of the claims and sufficiency of the complaint. <u>Eitel</u>, 782 F.2d at 1471. The Ninth Circuit has suggested that these two factors require that a plaintiff "state a claim on which the [plaintiff] may recover." <u>Danning v. Lavine</u>, 572 F.2d 1386, 1388 (9th Cir.1978)). In evaluating these factors, conclusions of law and allegations of fact that are not well-pleaded will not be deemed admitted by the defaulted party. <u>DirecTV, Inc. v. Hoa Huynh</u>, 503 F.3d 847, 854 (9th Cir. 2007).

Plaintiff alleges claims for racial discrimination in employment under Title VII, 42 U.S.C § 1981, and Nevada Revised Statute § 613.330. Nevada's anti-discrimination statute, NRS 613.330(1)(a), "is almost identical" to Title VII, <u>Apeceche v. White Pine Cty.</u>, 615 P.2d 975, 977 (Nev. 1980), and in light of that similarity, the Nevada Supreme Court "has long looked for

1    guidance from the federal courts in employment cases." Anderson v. Ruppco Inc., 281 P.3d 1150

2    (Nev. 2009) (citing Pope v. Motel 6, 114 P.3d 277, 280 (Nev. 2005); Apeceche, 615 P.2d 975,

3    977-78). Similarly, the analysis for a racial discrimination in employment claim under § 1981

4    claim follows Title VII principles. Fonseca v. Sysco Food Services of Arizona, Inc., 374 F3d 840,

5    850 (9th Cir. 2004). Accordingly, the Court analyzes all of Plaintiff's employment discrimination

6    claims under the Title VII framework.

7           For the following reasons, the Court finds that Plaintiff only states a claim for hostile work

8    environment and constructive discharge under Title VII.

9                           *i.    Racial Discrimination – Disparate Treatment*

10          Having reviewed Plaintiff's Complaint, the Court finds the first, fourth, and seventh causes

11   of action are brought under a disparate treatment theory. To establish a *prima facie* claim for

12   discrimination under a disparate treatment theory, Plaintiff must show that "(1) he is a member of

13   a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment

14   action; and (4) similarly situated individuals outside his protected class were treated more

15   favorably, or other circumstances surrounding the adverse employment action give rise to an

16   inference of discrimination." Peterson v. Hewlett–Packard Co., 358 F.3d 599, 604 (9th Cir. 2004)

17   (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

18          Plaintiff has adequately pled the first two elements: as a Black man he is a member of a

19   protected class, and he was a qualified line cook with over twenty years of experience. He fails,

20   however, to plead facts, beyond legal conclusions, sufficient for the adverse employment action

21   element. Importantly, an adverse employment action is a tangible decision made by the employer

22   that disadvantages the plaintiff-employee. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742,

23   761-62 (1998) ("A tangible employment decision requires an official act of the enterprise, a

24   company act. . . [which] constitutes a significant change in employment status . . .). And while the

25   Ninth Circuit defines "adverse employment action" broadly, cases finding an adverse employment

26   action all involve some tangible decision made by the employer (or a supervisor with authority

27   over the conditions of the plaintiff's employment). See e.g., Ray v. Henderson, 217 F.3d 1234,

28   1241 (9th Cir. 2000) (collecting cases where adverse employment action found in lateral transfers

of job duties; undeserved performance ratings; dissemination of unfavorable job references; exclusion from opportunities that could lead to promotion; more burdensome work schedules); see also Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000) (collecting cases). Here the only alleged adverse employment action was Olives' failure to remediate the discriminatory conduct of Plaintiff's coworkers.[2] As discussed below, this failure is sufficient to hold Olives' liable for discrimination under a hostile work environment culminating in constructive discharge theory, but not under a disparate treatment theory.

### i. Retaliation

Plaintiffs second, fifth, and ninth causes of action are for retaliation. To state a claim for retaliation, a Plaintiff must allege (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two. Brooks, 229 F.3d 917 at 928 (citing Payne v. Northwest Corp., 113 F.3d 1079 (9th Cir. 1997)). Plaintiffs Complaint adequately alleges he engaged in a protected activity by lodging complaints about racial harassment to Olives' HR, participating in the resulting investigation, and subsequently complaining about ongoing racial harassment to his supervisors. As to the second element, however, the Complaint fails to identify a tangible employment decision, attributable to Olives, that "a reasonable employee would have found . . . materially adverse, which in [the retaliation] context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Campbell v. Hawaii Dep't of Educ., 892 F.3d 1005, 1021 (9th Cir. 2018).

The only alleged decision by Olives was the decision not to take any action in response to Plaintiff's complaints. While Plaintiff alleges the coworkers' harassment intensified after Olives' investigation and failure to remediate, said coworkers' harassment cannot be attributed to Olives for purposes of a retaliation claim. See fn. 2, supra. Similarly, Plaintiff's constructive discharge

---

[2] Because the harassment was by Plaintiff's coworkers, rather than an employee with supervisory authority over Plaintiff, Olives could not be vicariously liable for that harassment. See Ellerth, 524 U.S. at 765 ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."); Vance v. Ball State Univ., 570 U.S. 421, 431-432 (holding an employee is a "supervisor" "only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassigning with significantly different responsibilities, or a decision causing a significant change in benefits.") (internal quotes omitted).

cannot be construed as a "tangible employment action" *directly* attributable to Olives, although Olives may still be liable for it under a failure to remediate theory, as discussed below. See Pennsylvania State Police v. Suders, 542 U.S. 129, 140-41 (2004). But absent allegations of any affirmative, materially adverse act attributable to Olives, beyond inaction, the Court finds Plaintiff fails to state a claim for retaliation.

### ii. Hostile Work Environment

Plaintiff's third, sixth, and eighth causes of action are for racial discrimination under a hostile work environment theory. Under Title VII, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). This prohibition encompasses the creation of a hostile work environment, which violates Title VII's[3] guarantee of "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 (1986). "Courts have long recognized that a workplace in which racial hostility is pervasive constitutes a form of discrimination." Woods v. Graphic Communications, 925 F.2d 1195, 1200 (9th Cir. 1991).

For the following reasons, the Court finds Plaintiff states a claim for discrimination against Olives under a hostile work environment theory.

### 1. Severe or Pervasive

To prevail on his hostile work environment claim, Plaintiff must adequately allege that, "in light of all the circumstances . . . the harassment [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1112 (9th Cir. 2004) (internal quotes and citations omitted). If harassment "pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position" it is sufficiently severe and pervasive. Id. at 1113. (citing Steiner v. Showboat Operating Co., 25 F.3d 1459, 1462-63 (1994)). Moreover, "the required level of severity or seriousness varies inversely with the pervasiveness or frequency

---

[3] 42 U.S.C. § 1981 also encompasses racial discrimination claims under a hostile work environment theory. Manatt v. Bank of America, NA 339 F.3d 792, 798 (9th Cir. 2003).

of the conduct." Id. (citing Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 872 (9th Cir. 2001).

The work environment must be both subjectively and objectively hostile—but where, as here, the plaintiff complained about the harassment to supervisors and the EEOC, subjective hostility is clearly established. Id. at 1113. Objective hostility in this case is evaluated from the perspective of a reasonable Black person. Id. at 1116 ("The omnipresence of race-based attitudes and experiences in the lives of Black Americans may cause even nonviolent events to be interpreted as degrading, threatening, and offensive"). (alterations in original, quotation and citation omitted).

The Court finds Plaintiff's allegations that he was subjected to racial slurs including "nigger" and "monkey" and other racially offensive "jokes" during the majority of his shifts with the harassing coworkers, over an extended period, establish that he was subject to severe *and* pervasive racial harassment that altered the conditions of his employment. See e.g., id. ("It is beyond question that the use of the word 'nigger' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is perhaps the most offensive and inflammatory racial slur in English . . . expressive of racial hatred and bigotry.") (citing Swinton., 270 F.3d at 817). Under all the circumstances, from the perspective of a reasonable Black person, persistently being called racial slurs such as "monkey" in front of coworkers, a supervisor, and—on one occasion at a company event—one's grandchildren, would be profoundly degrading, offensive, and evocative of the history of violent subjugation against Black Americans. Accordingly, Plaintiff's complaint sufficiently alleges harassment that was both subjectively and objectively hostile to state a claim for hostile work environment.

2.  Failure to Remediate

Where, as here, the alleged harassment that created a hostile work environment is by coworkers, not supervisors, the employer is not vicariously liable for the conduct of those coworkers, "so Plaintiff must prove that . . . the employer knew or should have known of the harassment but did not take adequate measures to address it. Id. at 1119 (citing Swinton, 270 F.2d at 803). "Remedial measures must include some form of disciplinary action . . . which must be proportionate to the seriousness of the offense." Id. at 1119-20 (citing Yamaguchi v. United States

1    Dep't of the Air Force, 109 F.3d 1475, 1492 (9th Cir. 1997); Ellison v. Brady, 924 F.2d 872, 882

2    (9th Cir. 1997) ("Title VII requires more than a mere request to refrain from discriminatory

3    conduct.")).

4         Plaintiff has alleged Olives had actual knowledge of the hostile work environment and

5    failed to adequately intervene. He complained about the racial harassment to the Olives' HR

6    Manager, who informed Olives' higher ups and conducted an investigation, which found no

7    malicious intent despite clear evidence to the contrary, and based on that finding Olives took no

8    remedial action, disciplinary or otherwise. Olives' response was plainly insufficient, because there

9    was no "discipline proportionate to the seriousness" of the racial harassment taken against the

10   harassing employees. McGinest, 360 F.3d at 1119-1120. The inadequacy of Olives' response is

11   especially clear given Plaintiff's allegations that the coworkers seemed more emboldened after the

12   conclusion of the investigation, and the harassment not only continued but intensified. Olives also

13   had actual knowledge the harassment was ongoing after its investigation because Plaintiff

14   subsequently complained to his supervisors—yet Olives took no further action. Olives' alleged

15   conduct in response to Plaintiff's complaints indicate the use of racial slurs in its workplace was

16   not taken seriously. Assuming these allegations as true, Olives is liable for the racially

17   discriminatory hostile work environment created by Plaintiff's coworkers.

18            ***iii.   Constructive Discharge***

19         Plaintiff hostile work environment claims allege that Olives' inaction, and the fact that the

20   racial harassment continued and intensified after Olives' investigation concluded, culminated in

21   his constructive discharge. Plaintiff also brings a separate claim for constructive discharge under

22   Nevada common law. However, because Plaintiff's constructive discharge claim arises out of

23   Nevada's employment discrimination statute, the appropriate standard is the federal standard. See

24   Liston v. Las Vegas Metro. Police Dep't. 908 P.2d 720, 723-24 (Nev. 1995) (adopting the Ninth

25   Circuit's standard for constructive discharge claims arising from Title VII and 42 U.S.C. § 1981

26   in evaluating the plaintiff's claim for constructive discharge arising under NRS 613.330). The

27   Ninth Circuit has further clarified that in a case like this one, a separate constructive discharge

28   claim will not be evaluated under state law: "Where a plaintiff alleges constructive discharge in

1  violation of a federal statute, constructive discharge is governed by a federal standard." <u>Wallace</u>
2  <u>v. City of San Diego</u>, 479 F.3d 616, 626, n. 3 (9th Cir. 2007) (citation omitted).

3      Constructive discharge occurs when, "looking at the totality of the circumstances, a
4  reasonable person in the employee's position would have felt that he was forced to quit because of
5  intolerable and discriminatory working conditions." <u>Wallace</u>, 479 F.3d at 625 (internal citations
6  and quotations omitted, alterations in original). To prevail, "a plaintiff alleging a constructive
7  discharge must show some aggravating factors, such as a continuous pattern of discriminatory
8  treatment." <u>Id.</u> (quotations omitted). As discussed above, Plaintiff has adequately alleged severe
9  *and* pervasive harassment and inadequate remedial action by Olives. Further, he alleges
10 aggravating factors in the fact that the harassing coworkers were emboldened by Olives' inaction,
11 and the harassment thus both continued and intensified. Despite Plaintiff again seeking
12 intervention from his supervisors, the harassment continued unabated. Under these circumstances,
13 a reasonable Black person in Plaintiff's position would have felt the discriminatory working
14 conditions were intolerable and felt forced to resign.

15     Accordingly, the Court finds Plaintiff adequately alleges the hostile work environment at
16 Olives culminated in his constructive discharge.

17     In sum, the second and third Eitel factors favor default judgment against Olives because
18 the allegations in the Complaint, taken as true, establish Olives' violation of Title VII, NRS
19 613.330, and 42 U.S.C. § 1981 under a hostile work environment and constructive discharge
20 theory.

21     **C. The Sum of Money at Stake**

22     Finally, the fourth Eitel factor considers the "sum of money at stake in the action." <u>Eitel</u>,
23 782 F.2d at 1471. In evaluating this factor, courts generally consider the amount of money at stake
24 in relation to the seriousness of the defendant's conduct. <u>PepsiCo, Inc.</u>, 238 F.Supp.2d at 1176.
25 Here, Plaintiff seeks $100,000 in compensatory damages, plus attorney's fees and costs. As
26 discussed below the Court further finds Plaintiff has proven he is entitled to punitive damages
27 against Olives in the amount of $100,000. Plaintiff is entitled to compensatory and punitive
28 damages by statute, and the total amount of damages ($200,000) does not exceed the statutory cap

under Title VII. See 42 U.S.C. § 1981a(b). Plaintiff is similarly entitled to reasonable attorney's fees by statute. 42 U.S.C. § 1988. Considering the seriousness of Olives' conduct and its failure to participate in this litigation, the sum of money at stake is reasonable and proportionate, and this factor favors entry of default judgment.

### D.  Summary of Eitel Factors

Upon consideration of the Eitel factors, the Court, in its discretion, finds entry of default judgment against Olives is warranted.

### E.  Damages

The scope of relief a Court may award in granting default judgment is limited by the kind and amount of damages which are sought in the Complaint. See Fed. R. Civ. P. 54(c). Where a plaintiff's complaint seeks damages in "an amount to be proven at trial," a district court is not barred from awarding damages in a default judgment, so long as the damages awarded do not differ "in kind" from those prayed for in the complaint. AirDoctor, LLC v. Xiamen Qichuang Trade Co., 134 F.4th 552, 554-55 (9th Cir. 2025).

#### i.  Compensatory Damages

For the following reasons, the Court finds Plaintiff has proven his compensatory damages in the amount of $100,000 for his emotional distress but declines to award damages for lost earnings.

Plaintiff's Complaint prays for compensatory damages in the form of "past, present, and future lost earnings; past, present, and future pain and suffering; and other losses associated with such embarrassment, humiliation, and mental and emotional pain in an amount to be determined at trial." The Court finds from the circumstantial evidence submitted and Plaintiff's testimony at the prove up hearing that he established his damages for emotional distress in the amount of $100,000. See Zhang v. American Gem Seafoods, Inc., 339 F.3d 1020, 1040-41 (9th Cir. 2003) (holding a plaintiff's testimony alone is enough to support a substantial award of emotional distress damages for a discrimination claim and collecting cases upholding such damage awards based on appropriate inferences from the circumstances).

Plaintiff failed to prove, however, his entitlement to lost earnings, because he did not

1    provide sufficient evidence—including at a minimum, a specified time-period—establishing the

2    amount of his past lost earnings following his constructive discharge, and, as his counsel

3    represented at the hearing, shortly after he resigned from Olives his medical condition rendered

4    him disabled unable to work. See Canova v. NLRB, 708 F.3d. 1498, 1505 (9th Cir. 1983) (holding

5    that "absent unusual circumstances" plaintiffs may not recover lost earnings for periods in which

6    they are unavailable for comparable work, even if due to a disability).

7            ii.  **Punitive Damages**

8            The Court further finds from the record that Plaintiff is entitled to punitive damages. Under

9    Title VII, victims of discrimination are entitled to punitive damages, if they can demonstrate by a

10   preponderance of the evidence that the defendant "engaged in a discriminatory practice or

11   discriminatory practices with malice or reckless indifference to the federally protected rights of an

12   aggrieved individual." 42 U.S.C. § 1981a(b). An employer may be vicariously liable for punitive

13   damages "where a supervisor who did not actually perpetrate the harassment but nonetheless was

14   responsible under company policy for receiving and acting upon complaints of harassment failed

15   to take action to remedy the harassment." Swinton, 270 F.3d at 810.

16           Moreover, a victim of racial discrimination, like Plaintiff Scott here, is entitled to a separate

17   punitive damages award under 42 U.S.C. § 1981, for which Congress has imposed no statutory

18   cap. See Flores v. City of Westminster, 873 F.3d 739, 760 (9th Cir. 2017) ("intentional

19   discrimination on the basis of race or ethnicity is especially reprehensible and a different kind of

20   harm, a serious affront to personal liberty . . . Congress has not seen fit to impose any recovery

21   caps under § 1981 . . .) (quotations and citations omitted).

22           As discussed in detail above, the Court finds the record clearly demonstrates that Olives

23   acted with reckless disregard of Plaintiff's civil rights in failing to take any disciplinary or remedial

24   action, despite its actual knowledge that its employees were racially harassing Plaintiff. In

25   particular, the Court finds the email exchanges between Plaintiff and Olives' HR Manager are

26   evidence that Olives knew it had a legal obligation to investigate his complaints and take

27   appropriate action but nevertheless decided not to intervene. See Kolstad v. American Dental

28   Ass'n, 527 U.S. 526, 536 (1999) ("[A] an employer must at least discriminate in the face of a

perceived risk that its actions will violate federal law to be liable in punitive damages."). Plaintiff has thus proven that Olives is vicariously liable for the intentional racial discrimination of Plaintiff by its employees and acted with reckless indifference to his right to a workplace free of racial harassment. The Court therefore finds Plaintiff has proven his entitlement to $100,000.00 in punitive damages.

### iii. Attorney's Fees and Costs

In a Title VII and 42 U.S.C. § 1981 action, a court has discretion to award reasonable attorney's fees and costs to the prevailing party. 42 U.S.C. § 2000e-5(k); 42 U.S.C. § 1988. Because the Court enters default judgment against Olives and in favor of Plaintiff, as the prevailing party, the Court in its discretion finds Plaintiff is entitled to his attorney's fees and costs.

Plaintiff's counsel has submitted an accounting of costs incurred in this case in the amount of $877.74, with supporting documentation. The Court finds an award of such costs is appropriate.

In Plaintiff's Motion for Attorney's Fees and Costs, counsel sought an award of 40% of Plaintiff's recovery based on his contingency fee agreement. However the Court must determine the amount of reasonable fees Olives must pay under federal statute, which has no bearing on the fee agreement between Plaintiff and his attorneys. See Venegas v. Mitchell, 495 U.S. 82, 90 (1990). The appropriate standard is the lodestar method. See Machowski v. 333 N. Placentia Prop., LLC, 38 F.4th 837, 840-41 (9th Cir. 2022). Plaintiff has submitted a motion for fees with evidence supporting the requested award, as required under the federal and local rules. See id. (citing Fed. R. Civ. P. 54(d)(2)(A)); see also Local Rules of Practice 53-14.

Under the lodestar method, the Court will thus award fees based on the number of hours reasonably expended on the instant litigation multiplied by a reasonable hourly rate. See Vogel v. Harbor Plaza Ctr., LLC, 893 F.3d 1152, 1160-61 (9th Cir. 2018). In this case, the Court finds counsel's amended affidavit and supporting documentation supports the award of $14,810.00 in attorney's fees, because the Court finds the hours expended, and hourly rates provided, as set forth in the affidavit are reasonable.

///

///

1    **V.    CONCLUSION**

2         For the foregoing reasons, **IT IS ORDERED** that Plaintiff's (ECF No. 10) Motion for

3    Default Judgment is **GRANTED** in part.

4         **IT IS FURTHER ORDERED** that Plaintiff is awarded compensatory damages in the

5    amount of $100,000.00 on his third, sixth, and eighth causes of action for hostile work environment

6    in violation of Title VII, NRS 613.330, and 42 U.S.C. § 1981.

7         **IT IS FURTHER ORDERED** that Plaintiff is awarded punitive damages in the amount

8    of $100,000.00 on his third and eighth causes of action for hostile work environment in violation

9    of Title VII and 42 U.S.C. § 1981.

10        **IT IS FURTHER ORDERED** that Plaintiff's first, fourth and seventh causes of action for

11   disparate treatment under Title VII, NRS 613.330, and 42 U.S.C. § 1981 are **DISMISSED** without

12   prejudice.

13        **IT IS FURTHER ORDERED** that Plaintiff's second, fifth, and ninth causes of action for

14   retaliation under Title VII, NRS 613.330, and 42 U.S.C. § 1981 are **DISMISSED** without

15   prejudice.

16        **IT IS FURTHER ORDERED** that Plaintiff's (ECF No. 24) Motion for Attorney's Fees

17   and Costs is **GRANTED** in part. Plaintiff is awarded $14,810.00 in attorney's fees and $877.74 in

18   costs.

19        **IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of

20   Plaintiff Steven Scott against Defendant Olives, Inc., in the amount of $215,687.74 with interest

21   accruing at the legal rate form the date of entry of this Order. The Clerk is further instructed to

22   close this case.

23

24   **DATED:** June 3, 2025.

25

26   _____

27   **RICHARD F. BOULWARE, II**
     **UNITED STATES DISTRICT JUDGE**

28